The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning, ladies and gentlemen. Judge Soong and I are very happy to be here this morning and to be joined by Judge John, Senior Judge John Antune of the Middle District of Florida who is helping us out and we very much appreciate his services. I am Mary Schroeder, a judge from Phoenix, based in Phoenix, Arizona. I am going to do the talking this morning because Judge Soong, who is presiding, has lost her voice. So with that little introduction, we'll proceed to hear the cases in the order that they are listed. First of all, we have two, three cases, four cases submitted on the briefs. Chobanian v. Garland, United States v. Lillard, numbers 256 and 020, Valencia Mata v. Garland, and Miguel Caballo v. Garland, and they are all ordered, submitted on the briefs. So we'll hear the cases for argument, the first being United States v. Lillard, 18-30106, etc. Good morning, Your Honors. Good morning. I'm Carl Gunn. I represent Mr. Lillard in his substantive appeal. I'm going to try to reserve four minutes for rebuttal and I'll try to keep track of my time. Back with your time. Thank you. I'm going to start with the denial of counsel issues. First, you have not even having appointed counsel for sentencing. Second, you have not having counsel of choice from the very start of the proceeding. On the right to at least appointed counsel, we're talking about the most fundamental right in our criminal justice system. Because of that, district courts have to, in this Court's own words, quote, indulge in every reasonable presumption against waiver, unquote. With that standard in mind, and any waiver has to be unequivocal. That's other language this Court has used. With that standard in mind, let's take a look at Mr. Lillard's letter to the Court on the second return to self-representation. It's at excerpts of record 441 to 43. It says on the first page that the request is, quote, since Mr. Gombiner, the defense attorney, refuses to file a motion, unquote. It says on the third page the request is, open quote, so I can file my motion, unquote. Then it proposes an alternative to self-representation. It says, and I'm quoting, I'm reading from the letter, in the alternative, I would like the Court to remove Mr. Gombiner as counsel and appoint Emily Gauss or whoever of the Court's choosing to represent me, whereas my total interest in capitals can be preserved for any potential appellate purposes. New counsel, I believe, with their pair of fresh eyes, will in fact determine that fair and just reasons exist to withdraw my plea. Your Honors, that does not approach being unequivocal, especially when we're talking about the most important right in our criminal justice system, especially when courts have to, quote, indulge in every reasonable presumption against waiver, unquote. At the very least, there had to be a hearing where the district court made an inquiry about, is this really what you want, or would you rather have a second attorney instead? And then he has a hearing on whether a second attorney is appropriate or something Mr. Lillard was entitled to. He had. Though the Ninth Circuit case law says if you go back to representation, there has to be a second Faretta inquiry. And the problem here, the problem here is not, there is an issue about whether he's informed of the nature of charges, of course, which I've raised, but that wasn't the main problem here with the second request. That was a secondary problem. But the main problem is whether it has to be unequivocal. The return to self-representation has to be unequivocal. And it isn't when you have a whole paragraph in the letters suggesting the alternative of substitute counsel. With that, the judge, I'm not saying the judge couldn't have ended up planning to represent himself. What I'm saying is he had to call him into court and make sure that's what he really wanted to that was really his first choice. And the judge didn't do that. Maybe because he was tired of Mr. Lillard. Maybe because he was upset about the allegation made against Mr. Gombiner. He just threw up his hands and said, I'm going to put you back into self- representation. That wasn't the way to do it. And the other problem here is, you know, the government... Counselor, in my understanding of U.S. Hansen, the Ninth Circuit case said that no second Faretta call occurred. That no second Faretta call is required unless there have been changed circumstances. Is that also your understanding of the case? And if so, what do you point to as changed circumstances that necessitated a second Faretta call in this case? The changed circumstances, Your Honor, and I think that Hansen recognizes this, are the return to representation. Once you return to representation, there's changed circumstances. And if you're going to go back, there needs to be a second Faretta hearing. The other problem here, of course, is I think in Hansen's case, there was no issue about an equivocal request. The purpose of the Faretta inquiry is to inform a defendant of the risk of self-representation, right? No, that's one purpose, Your Honor. The second purpose is to make sure it's unequivocal, to make sure that's really what he wants. And that's the problem that I think... Of course, that's the predicate to what I said. He wants to represent himself, and he makes a request. It has to be unequivocal. And the purpose of the inquiry is to make sure that he knows what he's doing in making that request, right? Well, the purpose of the inquiry... Both those things are the purpose of the inquiry. I understand. Hadn't that already been done at this point? The second request hadn't happened yet, so there'd been no inquiry into whether the second request was unequivocal. The first request, there'd been an inquiry into whether that was unequivocal. I understand. But there has to be an inquiry into whether the second request is unequivocal. And that, Judge Soong, I think is what distinguishes Hansen's. Hansen's also... You have this argument the government makes about waiver by conduct. And I think if you read the cases, I discussed them in my reply brief at page 10, there's nothing approaching the repeated manipulation and repeated playing with the system that there was in those cases. There's like years and years of dilly-dallying, or years and years of going through different attorneys, or asking an attorney to sign a contract, or that kind of thing. Here, there was one allegation against one attorney, which may well have been a product of misunderstanding or exaggeration. That's another reason you needed to hold a hearing. The judge may have been reasonable in saying, I don't believe Mr. Gombiner physically threatened him, but I think you need an inquiry, if you're going to try to assume that Mr. Lillard was like deliberately making something up to manipulate the system, I think you've got to have an inquiry about why you're saying he said this. It's easy for clients who are upset and caught up in their cases to misunderstand or exaggerate things. That's another reason we needed a hearing here. All we're saying is there had to be a hearing. And I think the Ninth Circuit case law, Your Honor, including Hansen's, supports that. I don't think Hansen's suggests that the changed circumstances don't include what I just described, and in any event, Hansen's didn't deal with an equivocal second request. There is also the counsel of choice issue. I wanted to spend a little bit of time on that, if the Court doesn't have other questions about the Feretta issue. You've got the Lewis case, and you've got the Kaplan and Drysdale case. The question is which one this is more like. I'd submit it's more like the Lewis case for a whole bunch of reasons. In Kaplan and Drysdale, you had a statute that said, as a matter of law, the proceeds in question, derived from the crime, become the property of the government upon commission of the crime. Here you have nothing like that. Here you have a lien interest. And first, the lien has to be perfected, and there's no indication of that in the record, because the government wasn't even acting under this statute. They were acting under the other statute that this Court then held didn't apply. Second, the lien is basically, whether it can be enforced, is in the discretion of the district court. The district court may, if the government tries to enforce the lien, order that the property in question be reimbursed. The property in question goes to the government. It also may choose not to. It can consider whether the defendant needs the money for reasonable expenses. And there isn't any case law directly on point, but I suggest reasonable expenses might well include attorney's fees for a new case. Councilwoman, returning to your argument that the lien wasn't a sufficient property interest. In Lewis, I understand the Court have analogized, they were discussing Kaplan and Drysdale and Monsanto. And the Court said, in those cases, the government's interest in the defendant's funds was like a lien. And they said, it's not as if the government actually owned the funds outright, but the government still had a sufficient property interest to outweigh the defendant's interest. So, if the analogy to a lien in those Kaplan and Drysdale and Monsanto was sufficient, why doesn't it apply to the defendant? Why isn't an actual lien, in this case, sufficient? I don't read Lewis that way, Your Honor. Lewis also, it emphasized and quoted the statutory provision that says the funds become the government's upon commission of the crime. In Lewis itself, there was a similar statute, not identical, but there's a section in the chapter of the code on health care fraud. That says the court can enjoin the defendant from disposing of any property equal in value to the alleged fraud. And, in fact, in Lewis, the court had done that. So, in Lewis, there had been a court order prior to the defendant trying to use the funds saying, you can't spend these because they're going to belong to the government if you get convicted. I think that's much more similar to the lien statute here, which has discretionary enforcement by the judge, than the mandatory statute in Kaplan and Drysdale, which provides in its own language that the funds become the government's upon commission of the crime. So, the court's going to have to decide rather than me getting to decide what Lewis means, but I'd submit that's what Lewis means. There's also, you know, Lewis recognizes that the Sixth Amendment interest is stronger than the government's interest in the funds. I think that reasoning applies equally to the lien interest. And there's the other reasons I suggest in the briefs how all of the grounds and rationales given in Lewis extend here. I did want to make just a couple of quick points on the other issues. I'm not sure, frankly, the court needs to reach those if it rules in Mr. Lillard's favor on the other issues, but I did want to highlight a couple points. On the loss issue, please consider the following admission by the agent, and I'm reading from Excerpt of Record 691. He testified, quote, there's no way to, well, there's no way now to connect them. They were, the ones that we were able to pull through surveillance are the only ones that we can say are connected to these guys. Unless we found particular card numbers in apartments and so on and so forth. I think that raises serious questions about whether there was sufficient proof tying all the loss here. The government has its little table that links 2 million plus, and we'll grant that. Those are all things that were linked by card numbers or merchant identification numbers or terminals or the hotel room that the conspirators were stayed at. But the rest of it was just speculation, maybe not speculation, but the agent's testimony. It's saying, oh, it's the same pattern. But there was nothing particularly unique about this pattern is the problem. On the search warrant falsities, one of the grounds for Mr. Lillard's motion to withdraw the plea, look at the contrast between what the affidavit said and what the report of interview said. According to the affidavit, the informant said Mr. Lillard kept a binder with cards, quote, in his possession at all times, unquote. According to the report of interview, he said, quote, I didn't see it when I was down there last time, unquote. And open quote, I think he put it somewhere, unquote. Not he has it in his possession at all times. According to the affidavit, the informant said Mr. Lillard kept the point of sale terminals, quote, in his immediate possession, unquote. By implication, they must be in his house, his apartment, if he's there. According to the report of interview, the informant said, quote, I don't know if he's got some with him all the time, unquote. Quote, sometimes he has someone else hold on to the machines, unquote. Quote, there's a storage unit with machines in it, unquote. That at least gave viable, plausible grounds for a motion to suppress under Franks. And that, of course, is all that's required for a motion to withdraw the plea under the McTiernan case. On the resentencing based on the error in the number of victims, you know, we can go back and forth about whether there should have been a cross-examination of this Vanteve investigator when he went back and forth multiple times. I argue there should be. But even if there's not, we know based on everybody's admission that the number of individual little merchant victims here was half what it was represented to be when Mr. Lillard was sentenced. That doesn't matter under the guidelines anymore. It used to, by the way, because there used to be a separate enhancement for 10 versus 50. Now there's not. But now we have Booker and 3553A, where the judge looks at all the facts and circumstances. And I think a lot of judges, certainly a defense attorney like me would be in there arguing there's a big difference between a big corporation like Chase losing money and these little mom and pop, you know, hair salons or whatever losing money. And you only got 30 of those, not 60. That's something Mr. Lillard should have gotten a new sentencing hearing to make an argument about. And that's, I think, our main point there on the number of victims issue. I will save the rest of my time for rebuttal unless the Court has questions. There don't appear to be any questions. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Michael Morgan for the United States. I will try to address all the issues that counsel has raised here. But just to start out, counsel made a brief quip that suggesting the district judge in this case was just fed up with Mr. Lillard. And respectfully, I think if you look at the entire record, you will see that this judge showed extreme patience with Mr. Lillard. Mr. Lillard was a very difficult defendant, and this judge bent over backwards to accommodate Mr. Lillard at every turn. So the notion that this district judge was just somehow fed up and was just making rulings off the cuff with no regard for Mr. Lillard's rights just doesn't, is not borne out by this record. Turning to the specific claims, with respect to counsel of choice, Luis is distinguishable factually and legally. Factually, there's no evidence in this record that there was an attorney who could ethically represent Mr. Lillard. The one attorney that he supposedly identified, Mr. Lillard himself said that that attorney had previously represented a co-defendant, and he accused that co-defendant of continuing to commit crimes. He made that, you know, he made those accusations in a letter to a state prosecutor. So Mr. Lillard made himself a potential witness against that co-conspirator, and that co-conspirator was a potential witness against Mr. Lillard. Under Washington's rules of professional conduct, which are applicable in the district court here, absent a written waiver from that former client, he could not, this attorney could not represent Mr. Lillard. So factually, there was no attorney that could represent him, so the factual credit for the claim fails. Legally, the difference between this case and Luis is that in Luis, the defendant had not been previously convicted of a crime. So it was undisputed that the government had zero interest in the untainted assets at issue. That's not true here. Mr. Lillard at the time of this case owed $750,000 in restitution in two prior Federal convictions. And this Court's decision in Mills squarely holds that the lien interest created by those restitution orders is a superior interest to the defendant's use of the funds. In fact, Mills was very similar to this case. There was $2,400 of untainted funds the defendant was asking to be returned to him. And this Court said, no, that lien interest is superior as long as those funds are needed to satisfy the restitution order. Mills is dispositive of the issue that's presented in this case. And Mills is completely consistent with Luis, again, because of the difference between the defendant being pre-conviction and post-conviction. And I would submit that the Fifth Circuit's decision in Scully is exactly on point with Mills. It follows the exact same rationale. So for that reason, factually and legally, there's just no choice of counsel problem. And there's procedural issues with this choice of counsel problem as well, namely that it was never raised in the district court at all. I mean, you can't fault a district judge if you don't even bring the issue to his attention. I mean, that's what I think is just really troubling here, is that we're talking about claims made in different cases, and that's somehow supposed to taint this criminal conviction? That just doesn't work. That's just not how the world works. It's crazy, frankly. With respect to the Feretta issue, the second Feretta hearing, I think you need to look at the context of when that request for counsel arose. Mr. Lillard had an adequate Feretta hearing once, was advised ad nauseum about the dangers of self-representation, why it was a terrible idea, why, given the issues that were going to be raised at sentencing, he was facing, you know, serious escalation of his sentence, and it would really be a good idea for counsel to help him. Mr. Lillard decided to proceed pro se, and the Court granted that request. Two days into the hearing, Mr. Lillard decides he wants his lawyer back. The District Court grants that request. The lawyer who tried the case? Well, this was a plea. I mean, up until then. Yes, he had represented him previously up until then. Says he wants his lawyer back because he was acting as standby counsel. The Court grants that request, but specifically tells Mr. Lillard, you know, I'm going to grant this request, but if you accept this, that's it. We can't go back and forth. And what does Mr. Lillard do two days, less than two weeks after the hearing? He sends a letter to the Court saying I want to go pro se. In direct, you know, the Court had told him that was not an option, and yet he did it anyway. That's why the government says this should be like a forfeiture by conduct. I mean, the defendant is playing games. It's very obvious the defendant is playing games, and the District Court is not required to indulge those games. Mr. Lillard wanted the go pro se. The Court gave him what he wanted. He had had an adequate forensic colloquy. Nothing really changed in the interim between the colloquy and that request to go pro se. I understand that he asked for counsel to be reappointed, and I understand that there is language in some of this Court's cases that say that can be an intervening circumstances. But the cases are fact-specific. There's no prophylactic rule, and any such prophylactic rule would be kind of contrary to the Supreme Court's decision in Tover, which sort of said, you know, we don't have prophylactic rules here. Ultimately, for Retta, we're just trying to make sure the defendant knows what he's doing and is doing it voluntarily. That's the ultimate goal here, and Mr. Lillard clearly knew what he was doing when he asked to go pro se the second time. With respect to whether or not that request was equivocal, I mean, I've read his letter, and I'm sure the Court has, too. He says twice in no uncertain terms, I want to represent myself. The alternative of having a different lawyer appointed is just that, an alternative, if the Court's not inclined to grant that request. But proffering an alternative does not make your request unequivocal. I mean, this Court's decision in Hernandez says precisely that. So I don't think there's any question that this was an equivocal request. With respect to the motion to withdraw the plea based on the search warrant, I want to point out that there's some factual differences between this case and McTiernan that show why McTiernan does not control here. In McTiernan, the issue the defendant wanted to raise for suppression was dispositive of the case. It was suppression of a recording that was the basis for the 1001 charge that McTiernan was facing. If he wins that suppression issue, the case is over. So the Court says, and the Court said, well, the argument he made, it may not necessarily win, and, in fact, it didn't win ultimately, but there was a realistic possibility of prevailing, and that made it plausible that a reasonable person would want to withdraw his plea. But that's not true here. The suppression issue that the defendant wanted to raise, even if he succeeded, wouldn't have resulted in dismissal of the case. There was evidence from the storage locker, from his co-defendant's apartment, that was still overwhelming proof of the case against him. So he's not going to get dismissal of the case. And it would have made no difference in sentencing, because the exclusionary rule doesn't apply at sentencing. So, in essence, the defendant was asking to raise a suppression issue that would have zero impact on the case. No reasonable person would want to pursue that. That's just a waste of everybody's time. And with respect to whether or not there was a realistic possibility, I mean, the short answer is we can debate the nuances of the affiance statements and the informant statements. I think there's a fair reading that it was a fair summary. But even if the court were to disagree, they just weren't material. The nature of this scheme left no question that it was reasonable to believe that there would be a fair probability, in the language of probable cause, that evidence would be at the defendant's home. It was a transient scheme, and it involved hundreds of credit cards. The natural inference, where do people keep their credit cards? They keep them at home. They also wanted his computer and cell phones. Where do people keep those? At their home. That's a reasonable inference a magistrate can draw just from the nature of the scheme. So, for that reason, too, McTiernan doesn't apply here. With respect to the number of victims in the case, there were over 20,000 transactions in this case. It would be unreasonable, and frankly, I don't think a district judge would put up with it, if we tried to sit there and tie 20,000 transactions to every single to a card in this case. The sentencing hearing would take a year. But the circumstances of the unlinked transactions were sufficiently similar that you can draw a reasonable inference under the preponderance of the evidence standard that the same conspiracy was involved. And I'll just give the Court one, two quick examples. In the Vantev losses, there were two periods, one a four-day period and one an eight-day period, in which each time there was over a million dollars in losses. It just defies credibility to think that there were two unaffiliated criminal organizations running the exact same scheme at the exact same payment processor. That's just not a reasonable inference to draw. And so the district judge could and the agents could make the reasonable inference that given the similarities, given the temporal links, that it was reasonable to infer that the uncharged or the unlinked losses were connected to this conspiracy. Again, sufficient for the preponderance of the evidence standard at sentencing. With respect to the number of victims, as it relates to the 3553A factors at least, I don't think it's fair to say that this is a material change in the evidence that would require a new sentencing hearing. It didn't change the guideline calculations, the Chase Payment Tech having absorbed those losses. It didn't change the number of victims enhancement, so it didn't affect the guidelines at all. It didn't affect loss amount. And it didn't really change the nature, in fact, at all, the nature of the criminal conduct. All it did was change who bore the loss. But that's not really a relevant consideration. And the fact that the merchants weren't victims under the guidelines, they were still victims of fraud. They were defrauded. So, I mean, the factual circumstances of the case are exactly the same. So there's no way that this would require a new sentencing hearing. I think I've touched on all the issues that counsel has raised. I think you have. Could I just ask you one question, going back before Mr. Gunn stands up again about the Ferretta hearings? Let me make sure I understand that your position is that the first Ferretta hearing was adequate. Yes. Our position is the first Ferretta hearing was adequate. And you have a disagreement with counsel on that? Well, yes. I mean, counsel is arguing that the first Ferretta hearing was inadequate because it didn't express the nature of the charges. Right. Would you address that? Sure. This is a post-plea Ferretta hearing. So there's really no need to address the nature of the charges. The defendant has already pled guilty to the crime. So he knows full well what he was accused of and what he admitted. That's his plea. What the Court needs to focus on is what's going to be happening at the proceeding where he's going to go pro se. And that's the issue of loss amount and all the other guidelines calculations. And that was discussed at length, and I don't think counsel would disagree with that, that that was definitely discussed at the Ferretta hearing. So that's our position. And the fact of the matter is, at the Ferretta hearing before the magistrate judge just two weeks earlier, which the district judge said on the record that he had listened to, Mr. Lillard admitted that he understood the nature of the crime. So the judge knew that Mr. Lillard had made that representation just two weeks  earlier. So there was really no need to go over that again. And I did want to just address one issue, because I expect counsel may raise it, with respect to Luis. There was a suggestion in the reply brief that Luis doesn't require the availability of an attorney ready to take the case. I would say legally that can't be right, because if a defense — if there isn't a lawyer, a private lawyer willing to take the case, by definition your right to counsel of choice can't be violated, because you don't have the right to force a private attorney to take your case. And factually, the attorney in Luis who litigated the case up to the Supreme Court was, in fact, the attorney who Mr. Luis was trying to retain. That's evident from the record in Luis. It's evident from the oral argument in Luis before the Supreme Court. And it's evident in Justice Kennedy's dissent, where he noted that not only did he want to retain counsel, but counsel's investigative team. So this idea that factually they don't have to show there's an attorney, it just doesn't — it's not borne out by Luis. Unless the Court has any other questions, and I ask that the judge be affirmed. There don't appear to be any further questions. Thank you, counsel.  Your Honors, I'll start by addressing Judge Schroeder's questions and counsel's response to that. Maybe in some situations it wouldn't be important to inform a defendant of the nature of the charges once he'd already pled guilty. But look at why Mr. Lillard wanted to represent himself. He wanted to represent himself to withdraw his plea. So he was going to be back at square one. A defendant who's thinking withdraw his plea certainly needs to know about the nature of the charge. And we also know, at least according to the — if the government's — Well, he just pled — there was — am I correct that there was no problem with the plea colloquy? You're not challenging that? I haven't challenged that. The problem with going back to the plea colloquy is that this Court has said you look to the entire record only in rare cases. Here the plea colloquies, of course, were six and nine months before. It wasn't like it happened just two weeks. Now, Mr. Lillard did say in the hearing before the magistrate judge just two weeks before that he understood the nature of the charges. But look at what his understanding was. We know what his understanding was from all the briefing he filed. According to the government, it's just this crazy idea about the bank fraud statute. So if you look at the record as a whole, you have to look at all the pleadings Mr. Lillard filed, and that seemed to exhibit a lack of understanding of the nature of the charge. So I think there is that additional problem, but you don't need to go there with respect to the second because of the equivocal nature of the request. I remember the standard we're talking about here. You certainly could read this letter as saying my first choice is representing myself, but you don't have to read the letter that way. And the standard this Court sets is indulge in every reasonable presumption against waiver, unquote. And it's not asking too much to just say you hold a hearing when you get a letter like this to find out what really the first choice is. And in fact, Hanses says that once you have the changed circumstances, and the changed circumstances include going back to self-representation by counsel, then you do have to have a second hearing. And in this case especially, you needed to have that because of the two different alternatives in the letter. I wanted to talk a little bit about counsel's arguments about the Luis case. He says the government had no interest in the proceeds here. Well, the government had gone to court, made a motion to enjoin the defendant from spending the money, and had that motion granted. I think that's a pretty similar interest to the lien interest that we're talking about here, which is totally discretionary. Counsel says there's no evidence an attorney was available. All he argues is, well, this attorney had a conflict. You can't decide based on – disqualifying an attorney because of conflict is something where this Court's case law, and I cite some of the cases in my brief, requires a hearing. You can't just decide there's a conflict based on this two-page letter and counsel's interpretation of the rules of ethics and not knowing whether in fact this attorney really represented the other person and what the nature of that representation was and so on. That would have required a hearing. The attorney had apparently decided he didn't have a conflict because he'd agreed to take on the representation. It would have been up to a court to decide whether to override that. Counsel says Mr. Lillard went to the wrong court. Well, you know who filed the first motion about these funds? It was the government, Your Honor. They filed the motion to take the funds, and they filed the motion in the same court Mr. Lillard went to. So Mr. Lillard's to blame for going to the same court the government went to? And the district judge here with the trial case didn't have any jurisdiction over that restitution order. He couldn't say these funds can't be taken for the other judge's restitution order. That's the judge who had jurisdiction. So I don't think the government gets around the problem that way. Mr. Gunn, you mentioned you focus on the necessity of a hearing, another FARETA hearing, I guess. Now, you already entered a plea, and you already had a FARETA inquiry done by the magistrate judge that you find no fault with, right? No, I do find fault with that, Your Honor. Oh, I thought you said it was okay. You haven't challenged it anyway here, right? I haven't challenged the plea. Okay. Okay. I just want to understand what you imagine would have been different with a third inquiry into the nature of the charges and the consequences of self-representation. A couple things I can think of, Your Honor. Okay. One would have been, first of all, we had this hearing, the guilty plea hearing. The magistrate judge two weeks earlier didn't just ask if he understood the nature of the charges. She didn't tell him what they were. She just took his word for it. What you would have said is, listen, we had these guilty plea hearings six months and nine months earlier. Remember, I told you the elements of the offense are X, Y, and Z. So I think when the hearings are that far back, you do that. Second, Mr. Lillard, you filed all these pleadings, and these pleadings seem to me, you don't understand the nature of the charges because you're saying X1, Y1, and Z1 when it's really X, Y, and Z. I want to make sure you understand that you're wrong about what you think the charges are. So those are two things. But on the second Feretta hearing, Your Honor, the critical thing was the primary reason it was needed there. What I just described is a problem with both Feretta hearings. But the second one, you needed to make sure, is this really what you want to do, Mr. Lillard, because you also ask for a new attorney, and you're entitled to ask for a new attorney instead if you want, and then I'll hold a hearing on whether or not that's appropriate. So which of these is your real desire? If we weren't dealing with such a critical ---- So did counsel mischaracterize what happened, opposing counsel? Because the letter, as he described it and as I understood it, was an alternative. In other words, if I can't represent myself, then I want an attorney. But if I represent myself, that was the primary request. I'm not sure you can read it that way. He does use the words in the alternative, but he doesn't say, if I can't represent myself quite directly. And he says much more ---- That's pretty lawyerly. We see that all the time. I'm sorry, Your Honor. Lawyerly. If I can't have this, in the alternative I request that. Well, that's true. But the lawyers, you're not giving up the most important right in the criminal justice system, and you're not dealing with a standard where you indulge every presumption against waiver, and you're not talking ---- and all we're talking about here is having a hearing to check, a hearing that the Ninth Circuit case law, I would submit, requires in any event, even if it wasn't equivocal. We've led you over time. I see, Your Honor. Thank you. Thank you, counsel. The case just argued is submitted for decision. We thank counsel for their arguments.
judges: SCHROEDER, SUNG, Antoon